IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 26, 2013

**STATE OF TENNESSEE v. RAYNELL HOPSON**

**Direct Appeal from the Criminal Court for Knox County**
**No. 94235        Bob R. McGee, Judge**

_____

**No. E2012-01300-CCA-R3-CD - Filed May 2, 2013**

_____

The Defendant pled guilty to aggravated assault, and the trial court sentenced him to four years, suspended after three months and nineteen days in confinement. In January 2012, the Defendant's probation officer filed an affidavit alleging that the Defendant had violated the terms of his probation. After a hearing on the allegation, the trial court revoked the Defendant's probation and ordered him to serve the balance of his sentence in confinement. On appeal, the Defendant contends that the trial court erred when it ordered him to serve the balance of his sentence in confinement. After a thorough review of the record and applicable authority, we conclude that the trial court did not err. The trial court's judgment is, therefore, affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

J. Liddell Kirk (on appeal) and Michael Graves (at revocation hearing), Knoxville, Tennessee, for the appellant, Raynell Hobson.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Randall Nichols, District Attorney General; and Debbie Malone, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Background**

On November 17, 2011, the Defendant pled guilty to aggravated assault and received a four-year sentence, most of which was ordered to be served on probation. On January 10, 2012, the trial court signed a violation of probation warrant, which alleged the Defendant had violated his probation by failing to pay court costs and by incurring new charges "where Charlene Hamilton is the listed victim."

At a hearing to determine whether the Defendant had violated his probation, the following evidence was presented: Charlene Hamilton said she had dated the Defendant for between ten and fifteen years. She said she was the victim of the aggravated assault to which the Defendant pled guilty in 2011. Hamilton said she was aware that the Defendant's probation required that he not have any "new trouble" with her. In January, after the Defendant was released from incarceration, he and Hamilton were engaged in "a little altercation" that "involved a little fist fight." Hamilton said this fight caused her to leave her home and stay with her daughters at their house.

Hamilton said that, after staying at her daughters' house for the weekend, she returned to her home on Monday to retrieve some clothing. She said the Defendant was not present in her home when she returned. Fifteen to twenty minutes later, however, he arrived and asked her for a cigarette. She informed him that she did not have any, and she noticed that the Defendant seemed to have an "attitude." The Defendant followed her into the kitchen, shoved her up against the stove, and hit her in the face. The Defendant said, "Well, I'm gonna show you," and Hamilton responded to him that she would call the police if he put his hands on her. The Defendant then struck Hamilton in the face, hitting her in the chin "really, really hard with his fist."

Hamilton said that, during this incident, her sister, Patricia Ann White, was present in the home. The Defendant threw a ceramic object out of the kitchen, almost hitting White. Hamilton said that White's boyfriend, "Mr. Wade," was also present and that he had to stand between Hamilton and the Defendant to keep the Defendant from hitting Hamilton. Hamilton said that, after this incident, she called the police.

During cross-examination, Hamilton testified that she and the Defendant often engaged in physical altercations. She conceded that sometimes she started the fights. She said, however, that since the Defendant began abusing her that he seemed "angry." Hamilton said that the first fight that the two engaged in, before she went to stay with her daughters, was a mutual fight. When she returned she and the Defendant, who was living in her home at the time, began fighting again.

On redirect examination, Hamilton clarified that the Defendant started the fight when she returned to her home.

Loren Harris, the Defendant's probation officer, testified that one of the special conditions of the Defendant's probation was that he was to have "no new trouble with Charlene Hamilton." In addition to the violation of this condition, Harris testified that the Defendant had violated several other rules of his probation. First, he had violated rule number one, that he would obey the law. Harris said he also violated rule number two, which required him to report all arrests, including traffic violations. Harris said the Defendant did not report his arrest on this domestic assault charge. He said the Defendant also violated rule number fourteen, which prohibited him from engaging in any assaultive, abusive, threatening, or intimidating behavior. Finally, Harris said the Defendant violated rule number nine, which required him to pay probation fees and court costs. Harris identified the probation violation report that he had created, and the trial court admitted that report into evidence as an exhibit.

During cross-examination, Harris said that he began supervising the Defendant in November 2011. The two met during intake on November 23, 2011. The Defendant reported on December 13th and 20th so the two could establish their "probationary corrective relationship." Harris agreed that the Defendant provided proof that he was receiving government disability and said he was to pay $25.00 per month toward court costs. He had not paid his court costs for December or for January, before he was arrested on January 9, 2012. Harris said that the Defendant complied with most of the rules of probation until his arrest. Harris testified that the Defendant did not report that he had been arrested for domestic assault.

The Defendant's attorney expressed the Defendant's desire to testify on his own behalf, opining that such may not be in the Defendant's best interest. Before the Defendant testified, however, the State's attorney informed the trial court that the Defendant had a pending charge for aggravated assault and vandalism. The trial court informed the Defendant that he did not have to testify and that he did not have to testify about the allegations of aggravated assault. The trial court warned that if the Defendant chose to testify his testimony could be used against him in the future.

The Defendant then testified that he felt he complied with the rules of probation. He said he reported to his probation officer as he should and that his first court payment was scheduled for a date in January that fell after his arrest.

The Defendant said that the incident with Hamilton occurred on January 7, 2012, at a time when Hamilton had "been drinking." The Defendant said Hamilton had been at a party, which the Defendant did not attend because he knew "drinking, it doesn't mix." The Defendant said that the "so called fight" was "one sided." Hamilton hit him, injuring his tooth, but he did not touch her. The Defendant said that Hamilton's daughter and two

grandsons were both present during the altercation, and the Defendant reiterated that he did nothing. Hamilton, he said, then took his money card, left with it, and was gone for two days. She returned with her sister and her sister's boyfriend and told the Defendant she had taken out an order of protection against him. When Hamilton noticed that the Defendant's bags were packed, "she just lost it."

The Defendant said that the first incident occurred on Saturday and he went to jail on a Monday. He said he was not able to call Harris because he was arrested right after this incident occurred. He further stated that the jail did not allow him to make a telephone call for over a week, and he had no family members in the area that he could contact.

The Defendant testified that he is disabled because he has "post manic depression, bipolar and anxiety. Plus [he's] a diabetic, asthmatic." He said he takes multiple medications to address his health issues, and he was not taking his medication at the time of the incident with Hamilton. He explained he had no transportation to get his medicines.

The Defendant said he went to live with Hamilton after being released from jail because he had no other place to go. The two, he said, had been living together for eighteen years, and Hamilton received his disability checks, so he felt he had to go and live with her.

The Defendant expressed his desire to return to probation, saying that if he was released he would not again live with Hamilton.

During cross-examination, the Defendant agreed he had a history of assaulting Hamilton. In 2003, he pled guilty to misdemeanor assault against her. The Defendant agreed that one of the conditions of his probation was not to have any trouble with Hamilton. The Defendant agreed that he and Hamilton immediately began having trouble. He said that the first incident was directly related to her drinking. He admitted he did not leave after this incident, saying that "sometimes when you're in a relationship you tolerate the intolerable." The Defendant agreed that the house belonged to Hamilton and that he stayed there after she left. He denied that, when she returned, he ever hit or pushed her. He opined that Hamilton did not suffer any injuries to her face. The Defendant said the entire fight was a figment of Hamilton's imagination.

The Defendant conceded that he pushed a ceramic pear, which broke in the process. He said he was upset because he found out that Hamilton had stolen his money with his money card. He said he also broke an iron and a light bulb after he found out she had taken his money. The Defendant further conceded that he had entered into negotiations with the State during which he expressed his willingness to plead guilty to the new charges and to

-4-

accept the probation revocation. He said he did not ultimately enter a guilty plea because he did not want to plead guilty to a crime he did not commit.

During further cross examination, the Defendant said that, while nothing "physical" occurred during the altercation, he did push a ceramic container off a counter, broke a light bulb with his hand, and threw an iron against the wall. The iron caused a hole in the wall when it hit the wall. The Defendant said that when he did these things Hamilton had left the house already. The Defendant said he was alone in the house when he "vent[ed]" by breaking the items. He further stated that this occurred on the first day of the argument after Hamilton left with his money card.

Based upon this evidence, the trial court found the following:

Well, it's clear that these folks, [the Defendant] and Ms. Hamilton, have a long standing relationship that is characterized by fighting and feuding and altercations of various kinds.

Apparently in 2003 [the Defendant] pled guilty to a misdemeanor assault on Ms. Hamilton. After that and at the time the assault in this case occurred he was under an order of protection, that's a legal attempt to keep them separate to protect her from any violence by him. And that didn't work.

The assault that we're dealing with here . . . occurred and that involved him striking her in the face, and other types of assaultive behavior. And then when this case was resolved and he was given a chance on probation, once again it was explained to him by the Court and by the probation officer he could not have any more trouble with her. And both parties are telling me that shortly after he got out they got into a fist fight, according to her. He's acknowledged there was an altercation. And that is all the notice he needs that there's going to keep on being trouble. And it was up to him to do whatever was necessary to prevent it from happening anymore.

In his own testimony he's acknowledged that the logical conclusion here is that he has to move out, but he didn't do that. He keeps thinking that – in fact, in his own testimony when the defense counsel asked him if he got probation what would he do to assure the [C]ourt this wouldn't happen again, he started talking about moving out. But then he transitioned into more discussion about their relationship, and he ended up saying he still thinks it's okay between them. He thinks they can make it.

This tells the Court this association, this relationship, is going to continue and the violence is going to continue. Orders of protection didn't stop it, probation hasn't stopped it. And as for the facts of this particular incident, the Court has listened to the testimony and listened to the internal consistency of the testimony, and the [C]ourt would have to say that it finds that the . . . State has produced clear and convincing evidence that Ms. Hamilton was the victim of an assault. It would be a misdemeanor assault at the hands of [the Defendant]. And that clearly violates his probation. And it's simply a continuation of a relationship that has been violent for years. And we've done everything we can to stop it, and nothing stops it. So the Court must conclude that probation has failed in this case. And the Court must remand [the Defendant] to the custody of the Tennessee Department of Corrections to serve his sentence.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant concedes that there was sufficient evidence presented at the hearing upon which the trial court could revoke his probation. He contends, however, that the trial court erred when it sentenced him to serve the remainder of his sentence in confinement.

In Tennessee, the procedure for a revocation of a probation sentence is set out in Tennessee Code Annotated section 40-35-311 (2010). The statute provides, in part, as follows:

Whenever it comes to the attention of the trial judge that any defendant, who has been released upon suspension of sentence, has been guilty of any breach of the laws of this State or has violated the conditions of probation, the trial judge shall have the power to cause to be issued under such trial judge's hand a warrant for the arrest of such defendant as in any other criminal case.

T.C.A. § 40-35-311(a).

A trial court may revoke probation upon its finding by a preponderance of the evidence that a violation of the conditions of probation has occurred. T.C.A. § 40-35-311(e)(2010). "In probation revocation hearings, the credibility of witnesses is to be determined by the trial judge." *State v. Mitchell*, 810 S.W.2d 733, 735 (Tenn. Crim. App. 1991). If a trial court revokes a defendant's probation, its options include ordering

-6-

confinement, ordering the sentence into execution as originally entered, returning the defendant to probation on modified conditions as appropriate, or extending the defendant's period of probation by up to two years. T.C.A. § § 40-35-308(a), (c), -310 (2010); *see State v. Hunter*, 1 S.W.3d 643, 648 (Tenn. 1999).

The judgment of the trial court in a revocation proceeding will not be disturbed on appeal unless there has been an abuse of discretion. *See State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *State v. Smith*, 909 S.W.2d 471, 473 (Tenn. Crim. App. 1995). In order for this Court to find an abuse of discretion, "there must be no substantial evidence to support the conclusion of the trial court that a violation of the conditions of probation has occurred." *State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001). Further, a finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *Shaffer*, 45 S.W.3d at 555 (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

After reviewing this case, we conclude that the trial court did not abuse its discretion when it ordered the Defendant to serve the balance of his sentence in confinement. As conceded by the Defendant, there was sufficient evidence to support the trial court's finding that he had violated the terms of his probation. Upon such a finding, the trial court's options include ordering confinement. *See* T.C.A. §§ 40-35-308(a), (c), -310. The trial court acted within its discretion, and the Defendant is not entitled to relief on this issue.

### III. Conclusion

Based upon the foregoing authorities and reasoning, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE